STATE OF NORTH CAROLINA v. DARNELL LAMAR DAWKINS

No. COA08-1257

(Filed 5 May 2009)

## 1. Homicide— felony murder—armed robbery—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss the charge of felony murder based on alleged insufficient evidence of the underlying felony of armed robbery because there was substantial circumstantial evidence from which the jury could conclude that defendant was the one who had robbed the victim and killed him in the process including that: (1) defendant was with the victim in the victim's car when he was last seen alive; (2) the victim rarely let anyone drive his vehicle, defendant was found driving the victim's vehicle with the victim's blood in it and a missing driver's side tinted window, and the window was found with the victim's body; (3) defendant bought bleach shortly after the victim's body was found, and the victim's broken cell phones were discovered behind the convenience store where defendant purchased the bleach; (4) the victim told a customer he was going to North Carolina to buy marijuana to sell it, and defendant had over $2,600, some of which had the victim's blood on it, and several bags of marijuana on his person when he was apprehended; and (5) hours after the victim was dead, defendant told his cousin that he and the victim were back in Virginia.

## 2. Firearms and Other Weapons— possession of firearm by felon—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss the charge of possession of a firearm by a felon because:

(1) a deputy testified that as defendant exited the victim's vehicle, he saw an object fall from defendant's person and a loaded five-shot .357 revolver was recovered at the place where the deputy saw the object fall; and (2) the victim was known to carry a .40 caliber weapon in a holster, he was shot with a .40 caliber weapon that was never recovered, and the jury could infer that defendant possessed the .40 caliber weapon in order to shoot the victim and continued to possess it until. he later disposed of it.

### 3. Jury— request to review testimony—plain error analysis inapplicable

The trial court did not commit plain error by denying the jury's request to review the testimony of two witnesses because: (1) plain error analysis applies only to instructions to the jury and evidentiary matters; and (2) defendant's argument concerns neither the jury instructions nor the admissibility of evidence.

Appeal by defendant from judgments entered 27 March 2008 by Judge John O. Craig, III in Guilford County Superior Court. Heard in the Court of Appeals 26 March 2009.

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General W. Dale Talbert, for the State.*

*Reita P. Pendry, for defendant-appellant.*

JACKSON, Judge.

Darnell Lamar Dawkins ("defendant") appeals his 27 March 2008 convictions of first-degree murder, assault with a deadly weapon on a government official, possession of a firearm by a felon, and fleeing to elude arrest with a motor vehicle. For the reasons stated below, we hold no error.

On 18 September 2006, Rahsaan Greenidge ("Greenidge") told Crystal Mullins ("Mullins"), to whom he frequently sold marijuana, that he was going out of town the next day to acquire marijuana to sell. Greenidge lived in Virginia with his fiancé, Letrice Dentley ("Dentley"). On the morning of 19 September 2006, Greenidge told Dentley that he was driving to North Carolina that day. Greenidge left home in a silver, 2004 Ford Crown Victoria with tinted side windows at approximately 8:30 a.m. Greenidge was very possessive of the car, rarely allowing anyone to drive it, even his fiancé in whose name it was titled. Greenidge typically carried two cell phones and two hand-

guns—a .40 caliber at his side in a holster, and a .357 revolver concealed in a pocket or in his car.

Shortly after leaving his home, Greenidge arrived at the home of Gloria Hurst ("Hurst"), a woman with whom he had been developing a romantic relationship, notwithstanding his engagement to Dentley. Greenidge arrived with defendant, who was Hurst's cousin. On a prior occasion, defendant and Greenidge had spoken privately outside Hurst's home; when Hurst asked about the conversation, Greenidge responded, "the less you know, the less you have to worry about." Greenidge and defendant left Hurst's home at approximately 9:30 a.m.

Greenidge spoke to Dentley and Hurst several times that day. The last time Dentley heard from him was between 1:00 and 1:15 p.m.; he told her he was on his way home. The last time Hurst heard from him was at 1:32 p.m.; he told her he would call her back later. Greenidge called Mullins at 2:08 p.m. and told her that he was not back in Virginia yet but would have marijuana to sell her when he returned. Beginning at approximately 2:00 p.m., Dentley placed several unsuccessful calls to Greenidge's phone. The first few rang, but were unanswered. Subsequent attempts resulted in a recorded message indicating that either the phone was turned off or not getting reception. Hurst attempted to call Greenidge several times between 5:00 and 7:00 p.m. None of her calls were answered.

At approximately 2:15, Greenidge's dead body was discovered lying face up across the center line of McConnell Loop. His body was riddled with bullets. Among the items police recovered at the scene were .40 caliber shell casings and tinted automobile window glass with a hole in it. Greenidge had over $500.00 in cash in his front pants pocket. The shell casings were fired from the same .40 caliber weapon. The bullets recovered from Greenidge's body also were all fired from the same gun, probably a .40 caliber. However, without a test weapon, it was impossible to determine whether the shell casings were fired from the same gun as the bullets. The trajectory of the bullets' path through Greenidge's body indicated that the fatal shots were fired from his right side at a relatively short distance.

At approximately 2:30 to 3:00 p.m., defendant purchased bleach at a convenience store near the location where Greenidge's body was found. He returned several times to purchase more bleach. At approximately 3:00 p.m., defendant attempted to visit Tynesha Holland ("Holland") at her apartment near the convenience store which also was near where the body was found. Although Holland was not at

home, defendant spoke to her neighbor. The neighbor described the car defendant was driving as a "gray, four door" with a window down even though it was raining.

At approximately 7:00 p.m., Hurst called defendant who told her that he and Greenidge were back in Virginia and that Greenidge had dropped him off in Portsmouth. At approximately 10:30 p.m., defendant was with Holland at her place of employment, a "gentleman's club" near her apartment, the convenience store, and the crime scene in North Carolina.

At approximately 12:00 a.m., Deputy Sheriff Kevin Wallace ("Deputy Wallace") observed defendant driving Greenidge's silver Crown Victoria, which had been reported stolen. When Deputy Wallace and Deputy Sheriff Julia Emory ("Deputy Emory") attempted to initiate a traffic stop, defendant failed to yield. A pursuit ensued, during which Corporal Terry Scott ("Corporal Scott") of the Greensboro Police Department attempted to block defendant's path with his unmarked patrol vehicle. Defendant struck the front, left corner of Corporal Scott's vehicle. The pursuit reached speeds of eighty to eighty-five miles per hour in a thirty-five mile per hour residential area.

Eventually, defendant lost control of the Crown Victoria and crashed into a chain-link construction fence. Defendant fled the car on foot. As defendant fled, Deputy Scott saw an object fall from his person. A loaded, five-shot .357 revolver was recovered at the location where Deputy Scott saw the object fall. Defendant was located hiding behind a residence a few hundred yards from the crash site, beneath an upside-down, deflated child's swimming pool. He had over $2,600.00 in his pockets, some of which was stained with Greenidge's blood, as well as several bags of marijuana.

The remains of two broken cell phones were recovered behind the convenience store where defendant had purchased bleach. Investigators were able to retrieve information from the SIM cards, including phone numbers for Dentley, Hurst, Mullins, and defendant.

Greenidge's blood was found in several locations within his car. Defendant's blood also was on the .357 revolver. The floor mats and driver's side window were missing from Greenidge's vehicle.

On 27 March 2008, a jury found defendant guilty of assault with a deadly weapon on a government official, possession of a firearm by a felon, fleeing to elude arrest with a motor vehicle, and first-degree

**STATE v. DAWKINS**

[196 N.C. App. 719 2009)]

murder pursuant to the felony murder rule. The trial court consolidated the charges and sentenced defendant to a term of life imprisonment without the possibility of parole. Defendant appeals.

[1] In his first two arguments, defendant challenges his conviction for first-degree murder. He argues that the trial court erred in denying his motion to dismiss the charge, and therefore, erred in instructing the jury on the charge. We disagree.

In order to survive a motion to dismiss criminal charges, the State must present substantial evidence "(1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980) (citations omitted).

> Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The terms "more than a scintilla of evidence" and "substantial evidence" are in reality the same and simply mean that the evidence must be existing and real, not just seeming or imaginary.

*State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982) (internal quotation marks and citations omitted).

> The evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion.

*Powell*, 299 N.C. at 99, 261 S.E.2d at 117 (citations omitted).

> The test of the sufficiency of the evidence to withstand the motion is the same whether the evidence is direct, circumstantial or both. When the motion . . . calls into question the sufficiency of circumstantial evidence, the question for the Court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty. In passing on the motion, evidence favorable to the State is to be considered as a whole in order to determine its sufficiency. This is especially

true when the evidence is circumstantial since one bit of such evidence will rarely point to a defendant's guilt.

*Id.* at 99, 261 S.E.2d at 117-18 (internal quotation marks and citations omitted) (alteration in original).

Here, although the State pursued the first-degree murder charge under theories of both (1) premeditation and deliberation and (2) felony murder, defendant was convicted only under a theory of felony murder. Defendant contends there was insufficient evidence to support the underlying felony of armed robbery.

"[T]he elements necessary to prove felony murder are that the killing took place while the accused was perpetrating or attempting to perpetrate one of the [statutorily] enumerated felonies." *State v. Richardson*, 341 N.C. 658, 666, 462 S.E.2d 492, 498 (1995). The enumerated felonies include robbery "or other felony committed or attempted with the use of a deadly weapon[.]" N.C. Gen. Stat. § 14-17 (2005). "The essential elements of robbery with a dangerous weapon are: '(1) an unlawful taking or an attempt to take personal property from the person or in the presence of another, (2) by use or threatened use of a firearm or other dangerous weapon, (3) whereby the life of a person is endangered or threatened.' " *State v. Haselden*, 357 N.C. 1, 17, 577 S.E.2d 594, 605 (quoting *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998)), *cert. denied*, 540 U.S. 988, 157 L. Ed. 2d 382 (2003); *see* N.C. Gen. Stat. § 14-87(a) (2005).

Defendant submits that there was no direct evidence of the identity of the perpetrator of the robbery and murder of Greenidge. However, there was substantial circumstantial evidence from which the jury could conclude that defendant was the perpetrator.

Greenidge left Virginia with defendant. Greenidge was alive at 2:08 p.m. and apparently still with defendant. Greenidge's body was found at approximately 2:15 p.m. with tinted automobile glass with a hole in it. Defendant was driving Greenidge's car, which had Greenidge's blood in it and was missing the driver's side tinted window. Greenidge rarely let anyone drive his car.

Defendant bought bleach shortly after Greenidge's body was found. Greenidge's broken cell phones were discovered behind the convenience store where defendant purchased the bleach. Greenidge had told Mullins he was going to North Carolina to buy marijuana to sell. Defendant had over $2,600.00—some of which had Greenidge's blood on it—and several bags of marijuana on his person when he

was apprehended. Hours after Greenidge was dead, defendant told Hurst that he and Greenidge were back in Virginia.

From this evidence, the jury could infer that defendant was the one who had robbed Greenidge and killed him in the process. Therefore, the trial court did not err in denying defendant's motion to dismiss and in instructing the jury accordingly. These arguments are without merit.

**[2]** In his next two arguments, defendant challenges his conviction for possession of a firearm by a felon. As in his prior arguments, he contends the trial court erred in denying his motion to dismiss the charge and in instructing the jury as to that charge. We disagree.

The essential elements of possession of a firearm by a felon are that (1) defendant was previously convicted of a felony and (2) thereafter possessed a firearm. *See* N.C. Gen. Stat. § 14-415.1(a) (2005). Defendant stipulated to the fact that he previously had been convicted of a felony.

Deputy Scott testified that as defendant exited the vehicle, he saw an object fall from defendant's person. A loaded, five-shot .357 revolver was recovered at the place where Deputy Scott saw the object fall. From this evidence, the jury could infer that defendant had the .357 in his possession just prior to exiting the vehicle.

In addition, Greenidge was known to carry a .40 caliber weapon in a holster. Greenidge was shot with a .40 caliber weapon. Greenidge's .40 caliber weapon was never recovered. From this evidence, the jury could infer that defendant possessed the .40 caliber weapon in order to shoot Greenidge and continued to possess it until he later disposed of it.

Because there was sufficient evidence presented that defendant possessed a firearm, having been convicted of a felony, the trial court did not err in denying defendant's motion to dismiss and instructing the jury on that charge. Accordingly, these arguments are without merit.

**[3]** Finally, defendant argues that the trial court committed plain error when it denied the jury's request to review the testimony of two witnesses. We disagree.

"[P]lain error analysis applies only to instructions to the jury and evidentiary matters." *State v. Greene*, 351 N.C. 562, 566, 528 S.E.2d 575, 578 (2000). Because defendant's argument concerns neither the

jury instructions nor the admissibility of evidence, we decline to address it.

For the foregoing reasons, we discern no error in the trial below.

No error.

Judges STEPHENS and STROUD concur.